**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 16-cr-129-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    VINCENT SCOTT MATHEWS,

      Defendant.

---

**ORDER ON PENDING MOTIONS**

---

Before the Court are nine motions filed by Defendant Vincent Mathews ("Mathews"):

1.    Motion to Suppress In-Court and Out-of-Court Identification Regarding Confidential Informant Number One (ECF No. 32);

2.    Motion to Suppress In-Court and Out-of-Court Identification Regarding CI-11317 (together with the previous motion, "Photo Lineup Motions") (ECF No. 33);

3.    Motion to Suppress Evidence Obtained Through Search Warrant of 1538 Uinta Street, Denver, Colorado ("Uinta Suppression Motion") (ECF No. 34);

4.    Motion Seeking Disclosure of Other Crimes, Wrongs, or Acts Pursuant to Rule 404(b) ("404(b) Motion") (ECF No. 35);

5.    Motion for Bill of Particulars (ECF No. 36);

6.    Motion to Suppress Warrantless Seizure of GPS Tracker Evidence ("GPS

Suppression Motion")  (ECF No. 37);

7.      Motion to Suppress Statements Made During Custodial Interrogation ("Interrogation Suppression Motion") (ECF No. 38);

8.      Motion to Exclude Expert Testimony Regarding GPS Coordinates or in the Alternative for a *Daubert* Hearing ("GPS *Daubert* Motion") (ECF No. 40); and

9.      Motion for Hearing (ECF No. 42), seeking an evidentiary hearing on the various suppression motions and the GPS *Daubert* Motion.

Having reviewed all of these motions, the Court finds no material factual disputes that require resolution, and thus the Court will deny the Motion for Hearing.  The Court's disposition of the various other motions is as follows.

## I. BACKGROUND

Believing that Mathews committed two pawn shop robberies (one on December 21, 2015, and the other on March 23, 2016), the Government charges Mathews with one count of conspiracy to interfere with interstate commerce in violation of 18 U.S.C. § 1951 (a.k.a. the Hobbs Act).  (*See* ECF No. 1.)  At the time of the alleged crimes, Mathews was in the custody of the Colorado Department of Corrections ("CDOC") as a "community inmate"—a status similar to parole, as described in more detail below (Part II.C.3).  At the direction of his parole officer, Mathews wore a GPS ankle monitor.

Much of the evidence asserted against Mathews came from the GPS data gathered from that ankle monitor by Aaron Anderson, a Colorado parole officer who was also assigned to a federal task force that had been investigating the robberies.  As

described by Mathews, Anderson "wore two hats" and was acting in his role as a federal officer at the time he accessed the GPS data. (ECF No. 37 at 2.) Anderson, who was not Mathews's assigned parole officer, affirms that he accessed Mathews's GPS data as part of the federal investigation, upon suspicion that Mathews had committed the pawn shop robberies, and not for any purpose specific to his duties as a parole officer. (ECF No. 72-4 at 3.) The GPS data allegedly show Mathews on the premises of the two pawn shops when the robberies occurred. (*See* ECF No. 1-1 ¶¶ 6–7.)

Mathews now brings several motions related to that GPS evidence, as well as related to photo lineup evidence that the Government intends to use against him. Mathews also seeks various other forms of relief, all addressed below.

## II.  GPS SUPPRESSION MOTION (ECF No. 37)

The motion with the most potential impact on this case is Mathews's GPS Suppression Motion. The Court will therefore address it first.

Mathews asserts that the federal task force, acting alone, could never have obtained his GPS data without a warrant, and therefore Anderson could not share it with the federal task force without a warrant. (ECF No. 37 at 2–3.) For the reasons explained below, the Court finds that Anderson lawfully accessed Mathews's GPS data and lawfully shared it with the federal task force.

### A.  GPS Searches & Lawfulness of Sharing Information

A government "conducts a search" within the meaning of the Fourth Amendment "when it attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements." *Grady v. North Carolina*, 135 S. Ct. 1368, 1370

(2015).  In fact, it is a perpetual search for the entire time that the device is capable of transmitting the person's whereabouts.  *See id*. at 1371 (rejecting argument that no search exists until the government actually accesses GPS-obtained data: "The State's program is plainly designed to obtain information.  And since it does so by physically intruding on a subject's body, it effects a Fourth Amendment search.").  Thus, Colorado parole authorities such as Anderson were perpetually "searching" Mathews within the meaning of the Fourth Amendment for as long as he wore the ankle monitor.[1]

Nonetheless, Anderson's GPS-enabled search was not necessarily unlawful. *See id*. (remanding to lower court to determine whether search-via-ankle-monitor was reasonable under the totality of the circumstances).  And, if Anderson lawfully obtained Mathews's GPS coordinates, nothing prevented him from sharing what he learned with federal investigators.  "Evidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for a use different from that for which it was originally taken."  *United States v. Lester*, 647 F.2d 869, 875 (8th Cir. 1981); *see also* 1 Wayne R. LaFave, *Search & Seizure* § 1.5(c) n.155 (5th ed., Oct. 2016 update) (citing additional similar cases).

## B.    Relevant Case Law

Given the foregoing, the question is not whether Anderson could permissibly share GPS data with the federal task force, but whether Anderson himself lawfully "searched" Mathews by accessing his GPS data specifically on suspicion of committing

---

[1] An ankle monitor can lose power or otherwise malfunction.  Conceivably, no "search" would be taking place during such periods.  The Court need not resolve that issue because no party suggests that Mathews's ankle monitor ever became incapable of transmitting his location.

a crime, as opposed to accessing it for a purpose arising from Anderson's role as a parole officer. Particularly relevant to this inquiry—*i.e.*, the relevance of the parole officer's specific motivation for the search—is a progression of Supreme Court and Tenth Circuit cases from 2001 to 2013.

The first case is *United States v. Knights*, 534 U.S. 112 (2001). The defendant there had been sentenced by a California court to probation for an unrelated drug offense. *Id*. at 114. The probation order required the defendant to submit to searches by any probation officer or law enforcement officer essentially for any reason, with or without suspicion. *Id*. at 114–15. A police detective soon began to suspect that the defendant was involved in a string of arsons and pipe-bombings of power company equipment, and the detective chose to search the defendant's home without a warrant, given the probation conditions. *Id*. at 115. Based on the evidence gathered in that search, the defendant was eventually charged with various federal crimes. *Id*. at 115–16. The district court granted a motion to suppress, accepting the argument that the detective's "search was for 'investigatory' rather than 'probationary' purposes." *Id*. at 116. The Supreme Court rejected this distinction and reversed. Applying a general reasonableness-under-all-the-circumstances test, the Supreme Court found that the probation search condition "significantly diminished [the defendant's] reasonable expectation of privacy." *Id*. at 117–20. Thus, the detective's reasonable suspicion was enough to justify the search under the Fourth Amendment. *Id*. at 120–21. Given that reasonable suspicion existed, the Court chose not to reach the question of whether the detective could have invoked the probation search condition to search the defendant's

home even without reasonable suspicion of a crime. *Id.* at 120 n.6.

The next relevant case is *United States v. Tucker*, 305 F.3d 1193 (10th Cir. 2002). The defendant there was on parole for a Utah crime and was subject to search "upon reasonable suspicion to ensure compliance with the conditions of [his] parole." *Id.* at 1195–96 (internal quotation marks omitted). Eventually law enforcement officers began to suspect that the defendant possessed child pornography. *Id.* at 1196. The defendant's parole officers then led other law enforcement officers in a warrantless search of the defendant's home and recovered a computer containing child pornography. *Id.* at 1196–98. Federal charges followed and the defendant moved to suppress, but the district court denied that motion. *Id.* at 1198. The Tenth Circuit affirmed. Relying on *Knights*, the court noted that "[a] parole agreement containing a provision allowing the search of a parolee's residence diminishes the parolee's reasonable expectation of privacy in his residence." *Id.* at 1199.[2] Moreover, the defendant's parole agreement

> contained a search provision authorizing officers to search his home for a violation of any parole condition. One of those parole conditions was that he comply with all federal, state, and municipal laws. This case is thus materially indistinguishable from *Knights* in which the probationer's probation agreement authorized searches for any law enforcement purposes. Therefore, even assuming that the search was a subterfuge for a law enforcement investigation, it was permissible under general Fourth Amendment principles if the officers had reasonable suspicion that contraband was located at [the defendant's] residence or that a crime had taken place. As in *Knights*, the officers'

---

[2] The Tenth Circuit recognized that "*Knights* involved the search of a probationer's home," rather than a parolee's home, but noted that the court had "previously treated parolees and probationers identically for Fourth Amendment purposes." *Id.* at 1199 n.9.

motivation is irrelevant.

*Id*. at 1200 (citation omitted).  The court eventually went on to find that reasonable suspicion existed, and therefore the search of the defendant's home was valid.  *Id*. at 1200–01.

Four years after *Tucker* and five years after *Knights*, the Supreme Court returned to the same basic issue in *Samson v. California*, 547 U.S. 843 (2006).  There, the defendant was on parole and a police officer chose to search him entirely without suspicion of wrongdoing.  *Id*. at 846–47.  The police officer justified his search under California Penal Code § 3067, which directs that parolees receive notice that they may be subject to search at any time, with or without suspicion.  *Id*.  The police officer discovered methamphetamine on the defendant's person.  *Id*. at 847.  The California trial court denied his motion to suppress and the California Court of Appeal affirmed, holding that suspicionless searches of parolees are lawful in California so long as they are "not arbitrary, capricious or harassing."  *Id*.  The U.S. Supreme Court then granted certiorari "to answer a variation of the question this Court left open in [*Knights*]— whether a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment."  *Id*.  The Supreme Court answered in the affirmative, reasoning that California Penal Code § 3067 "clearly expressed" to the defendant that he could be subject to such searches, and the defendant "signed an order submitting to the condition and thus was unambiguously aware of it."  *Id*. at 852 (internal quotation marks omitted).  Therefore, "[e]xamining the totality of the

circumstances pertaining to petitioner's status as a parolee, an established variation on imprisonment, including the plain terms of the parole search condition," the Supreme Court "conclude[d] that [the defendant] did not have an expectation of privacy that society would recognize as legitimate." *Id*. The court deflected concerns about "officers['] unbridled discretion to conduct searches" by pointing to "California's prohibition on 'arbitrary, capricious or harassing' searches." *Id*. at 856.

A year after *Samson*, the Tenth Circuit decided *United States v. Freeman*, 479 F.3d 743 (10th Cir. 2007). The defendant was a Kansas parolee subject to "search by parole officer(s) of [his] person, residence, and any other person under [his] control." *Id*. at 744–45 (internal quotation marks omitted). Law enforcement officers conducted a warrantless search of his home and discovered contraband, leading to federal charges. *Id*. at 745. The district court denied his motion to suppress, but the Tenth Circuit reversed. The Tenth Circuit synthesized *Knights*, *Tucker*, and *Samson* to stand for the idea that state law largely dictates a parolee's expectation of privacy. *Id*. at 746–48. It emphasized that *Samson*, in particular, did not announce "blanket approval for warrantless parolee or probationer searches by general law enforcement officers without reasonable suspicion; rather, the [Supreme] Court approved the constitutionality of such searches only when authorized under state law." *Id*. at 748. Kansas had "not gone as far as California in authorizing such searches" because the search condition specifically stated that parole officers, not any law enforcement officer, could conduct a search. *Id*. Moreover, Kansas correctional regulations further emphasized that only a certain subset of parole officers (known as "special enforcement officers") could

conduct a search of a parolee's home, and even then only on reasonable suspicion of

violation of the parole agreement.  *Id*. at 744, 748.  Because the defendant's home was

searched by local police officers, and without reasonable suspicion of a parole violation,

the Tenth Circuit found the search unlawful.  *Id*. at 748–50.

    *Freeman* strongly suggests that state law establishes a floor below which a

parolee's privacy expectations may not drop.  *See id*. at 747–48 ("Parolee searches are

therefore an example of the rare instance in which the contours of a federal

constitutional right are determined, in part, by the content of state law.").  Six years

later, however, the Tenth Circuit reasoned in *United States v. Mabry*, 728 F.3d 1163

(10th Cir. 2013), that there may be a cellar beneath this floor.

    The defendant in *Mabry*, like the defendant in *Freeman*, was a Kansas parolee

whose home was searched.  *Id*. at 1165.  Unlike in *Freeman*, the search at issue in

*Mabry* was conducted by a special enforcement officer, as Kansas regulations require.

*Id*. at 1165–66.  But the special enforcement officer had apparently violated another

Kansas correctional regulation requiring special enforcement officers "to get prior

approval from a supervisor to search [a] residence."  *Id*. at 1169.  The Tenth Circuit

acknowledged the potentially analogous situation in *Freeman* but also drew on

statements from *Tucker* that a search conducted in violation of state law could

nonetheless be upheld under a "totality of the circumstances" inquiry.  *Id*.  Evaluating

that totality, the Tenth Circuit concluded that "the alleged failure to get prior permission

from a supervisor had a minimal impact on [the defendant's] expectation of privacy and

the State's interest in supervising."  *Id*.  Thus, "his limited expectation of privacy was

outweighed by the State's strong interest in monitoring his behavior and preventing his recidivism." *Id*. at 1169–70.

## C.     Legitimate Expectations of Privacy in Colorado

Applying *Knights*, *Tucker*, *Samson*, *Freeman*, and *Mabry* to this case, the Court must determine what legitimate expectations of privacy Mathews could have under Colorado law in light of his status as a community inmate.  In so doing, the Court could compare Mathews's legitimate expectations, if any, to a circumstance in which Anderson possessed reasonable suspicion that Mathews had committed the pawnshop robberies.  The Court instead assumes a state of affairs most favorable to Mathews, namely, that Anderson accessed Mathews's GPS data on an inchoate hunch, with no real reason to associate Mathews with any of the robberies under investigation by the federal task force.

A community inmate is a CDOC inmate placed in the Intensive Supervision Program ("ISP"), which CDOC is authorized by statute to implement for inmates "not having more than one hundred eighty days remaining until [their] parole eligibility date[s]."  Colo. Rev. Stat. § 17-27.5-101(1)(a).  ISP is like parole, "[t]he main difference [being] that since [inmates] are still serving their court-ordered period of incarceration, the limitation on their rights is not pursuant to a voluntary [parole] agreement, but is imposed by the statutory authority granted to the CDOC to regulate the affairs of inmates."  (ECF No. 72-4 at 1.)

As far as the Court's research reveals, the statutes governing the ISP do not specifically authorize searches.  Rather, the statutes establish "minimum" restrictions on

10

offenders (*e.g.*, "monitored curfew . . . at least once a month") and otherwise delegate to CDOC "the power to establish and enforce standards and criteria for administration of intensive supervision programs."  Colo. Rev. Stat. § 17-27.5-102(1), (2).  The Court therefore finds it helpful to discuss Colorado's parole statutes, as a reference point for the expectations of privacy a community inmate may have.

1. Parolees' Legitimate Expectations of Privacy

Colorado's parole statutes require that,

> [a]s a condition of every parole, the parolee shall sign a written agreement that contains such parole conditions as deemed appropriate by the board, which conditions shall include but need not be limited to the following: * * * That the parolee shall . . . allow the community parole officer to make searches of his or her person, residence, or vehicle . . . .

Colo. Rev. Stat. § 17-2-201(5)(f)(I)(D).  The Colorado Supreme Court extensively discussed the scope of this parole condition in *People v. McCullough*, 6 P.3d 774 (Colo. 2000)

The first question answered in *McCullough* was whether the Colorado Legislature intended the parole search condition to grant authority to parole officers to conduct suspicionless searches.  In light of the Colorado Supreme Court's prior case law on parole searches, and in light of a particular statutory amendment, the court answered that question in the affirmative: "We conclude that the legislature intended to give parole officers authority to conduct routine searches of a parolee and his possessions as part of their supervisory authority and without requiring that they first possess reasonable grounds to believe that a parole violation has occurred."  *Id*. at 778 (internal quotation marks omitted).

The court therefore proceeded to the next question, *i.e.*, whether suspicionless searches of parolees violate the Fourth Amendment. The court's holding in this regard makes the resolution of Mathews's motion somewhat more complicated than it would otherwise appear in light of the U.S. Supreme Court and Tenth Circuit authorities discussed above:

> We hold that a warrantless parole search is constitutional, even in the absence of "reasonable grounds," if the search meets the following requirements: (1) it is conducted pursuant to any applicable statute; (2) it is conducted in furtherance of the purposes of parole, i.e., related to the rehabilitation and supervision of the parolee; and (3) it is not arbitrary, capricious, or harassing.

*Id*. at 781.

The second requirement is the most significant for present purposes. Regarding that requirement, the Colorado Supreme Court elaborated that parole searches "may not be conducted simply as a subterfuge for criminal investigations. '[They] may not be done for the prime purpose of circumventing the ordinary constitutional processes for the convenience of law enforcement officers in the course of their investigation.'" *Id*. at 782 (quoting *People v. Way*, 319 N.Y.S.2d 16, 21 (Nassau Cnty. Ct. 1971)). The court also took the time to summarize the quoted *Way* case, apparently as an example of what would violate the second requirement:

> In *Way*, police contacted the parole officer and told him that his parolee was a suspect in a robbery. The parole officer took no steps to visit or interview his parolee until the police contacted the parole officer again two weeks later and requested that he accompany them on a search of the parolee's house for the purpose of investigating the robbery. The court found that the parole officer had become "nothing more than the alter ego of the detectives," stating, "This

12

case does not present the usual situation where a parole officer may engage the services of the local policeman on the beat to protect him while he is engaged in searching a parolee or his home. Reference to the facts found herein demonstrate that the police were not mere bystanders but that they inspired, initiated, arranged and actively participated in every phase of the search and seizure." *Way*, 319 N.Y.S.2d at 23, 24.

*Id*. at 782 n.12.[3]

## 2.    Effect of *McCullough* in Mathews's Circumstance

At first glance, the foregoing discussion from *McCullough* would seem to all but require that the Court find Anderson's search of Mathews unlawful. For several reasons, however, *McCullough* does not actually dictate that outcome.

First, the only interpretation of Colorado law announced in *McCullough*—the only portion of the opinion that binds this Court—is its announcement that the parole search statute permits suspicionless searches. *McCullough's* three requirements for a proper suspicionless parole search, by contrast, come from the Colorado Supreme Court's understanding of what the Fourth Amendment requires. *See id*. at 778–79 ("we now must consider whether the [parole search statute] as enacted violates constitutional proscriptions against unreasonable searches and seizures"); *see also id*. at 779–82 (analyzing only U.S. Supreme Court cases and lower court cases interpreting the Fourth Amendment). Federal courts are "not bound by a state court's interpretation of

_____

[3] *McCullough* apparently never had occasion to consider how a parole officer should proceed if he or she suspects that the parolee is violating the nearly ubiquitous parole condition that forbids violation of any federal, state, or local law. *Cf. Tucker*, 305 F.3d at 1200. It would seem beyond debate that investigating a parolee's compliance with this parole condition would be "in furtherance of the purposes of parole," but it also appears indistinguishable from an impermissible "criminal investigation." *See McCullough*, 6 P.3d at 781, 782.

the Fourth Amendment." *United States v. Madden*, 682 F.3d 920, 927 (10th Cir. 2012).[4]

Second, the Colorado Supreme Court's interpretation of the Fourth Amendment (and those of the cases it relied upon) has turned out to be incorrect as to the question of the parole officer's purpose or motivation. Just one year after *McCullough*, the Supreme Court decided *Knights* and squarely rejected the argument that the Fourth Amendment required an inquiry into the purpose of the search. *See* 534 U.S. at 116–22. Thus, *Knights* abrogated *McCullough* to the extent *McCullough* held that the Fourth Amendment requires an inquiry into the parole officer's purpose or primary motivation.

Third, the precise question at issue here is a community inmate's legitimate expectations of privacy, not a parolee's expectations. The Colorado Supreme Court has never squarely addressed that issue. If and when it does, it cannot impose a purpose inquiry as a matter of the Fourth Amendment—*Knights* and *Samson* foreclose that argument. It would need to locate the purpose requirement somewhere in Colorado law. *Cf. Freeman*, 479 F.3d at 746–50.

---

[4] *McCullough* once mentions the Colorado Constitution's equivalent to the Fourth Amendment. *See id.* at 779 ("The Fourth Amendment of the United States Constitution and article II, section 7 of the Colorado Constitution proscribe all unreasonable searches and seizures." (citing Colo. Const. art. II, § 7)). But *McCullough* offers no analysis specific to the Colorado Constitution other than to mention that it and the Fourth Amendment "share the same analytical framework in the instant case." *Id.* at 779 n.8. In any event, given that this is a federal prosecution, "[w]hether an arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended." *Madden*, 682 F.3d at 927 (internal quotation marks omitted).

3.      Community Inmates' Legitimate Expectations of Privacy

The Court thus turns to the ultimate question in this case: whether Colorado law in any way creates a legitimate expectation in community inmates that suspicionless, warrantless searches will only be conducted for purposes directly related to supervision of the community inmate.[5]

At the outset, the Court notes the Supreme Court's observation that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment."  *Samson*, 547 U.S. at 850.  *A fortiori*, community inmates have even fewer expectations of privacy, given that they have not yet progressed to parole status.  *Cf. Townsend v. People*, 252 P.3d 1108, 1116 (Colo. 2011) (Bender, C.J., concurring in part and dissenting in part) (analogizing the ISP to "a work release facility . . . an extension of our state's traditional correctional facilities").[6]

As noted above, CDOC, through its regulatory authority, establishes most of the requirements of community inmate status.  It has exercised that regulatory authority to promulgate a standard form of conditions that community inmates must acknowledge. (*See* ECF No. 72-3 at 6–8.)  Mathews received this form and acknowledged each of its conditions with his initials.  (*See* ECF No. 57-1.)  Among those conditions was, "You shall allow your CPO [Community Parole Officer] to search your person, vehicle,

---

[5] Assuming *arguendo* that such a distinction is logically tenable when the community inmate must obey all federal, state, and local laws.  *See supra* note 3.

[6] Given that community inmate status is not something to which an inmate voluntarily agrees, one might analogize it to a facility transfer and conclude that community inmates have no more Fourth Amendment rights than inmates housed within prison walls—which is essentially no Fourth Amendment rights.  *See Hudson v. Palmer*, 468 U.S. 517, 536 (1984). The Court finds that it need not go this far to resolve this case.

residence or any property under your control."  (*Id*. ¶ 14.)  Thus, similar to *Knights* and *Samson*, it was clearly expressed to Mathews that he could be subject to such searches.  But, unlike *Knights* and *Samson*, the search condition does not specifically announce that the search can be for any reason, with or without suspicion.  Even so, nothing in Colorado law would raise a community inmate's expectations in this regard. *McCullough* definitively construed the Colorado parole search statute to authorize suspicionless searches of parolees, and a community inmate cannot reasonably expect to have even greater privacy rights than a true parolee.

There remains one additional hurdle to deeming Anderson's GPS search of Mathews lawful.  The community inmate search condition says that "your CPO" may conduct a search; it does not say "any CPO."  The Tenth Circuit's *Freeman* decision strongly suggests that this is a material distinction, whereas the *Mabry* decision holds that the distinction is only "a factor to consider" under the totality of the circumstances. *See* 728 F.3d at 1169.[7]

Considering: (a) cases such as *Samson* which would permit a state to authorize suspicionless parole searches by any law enforcement officer, and (b) the Court's own experience that law enforcement officers uniformly prefer expansive over limited search powers, the Court presumes that CDOC would not have limited the community inmate search condition to "your CPO" without a specific reason.  Although the Court has not been informed of the actual motivation, the Court could understand why it might exist.

---

[7] Mathews actually makes no argument in this regard.  In its discretion, the Court reaches the issue given that an individual's freedom is at stake and the question of GPS surveillance is of particular salience as the technology becomes pervasive.

If someone may search "your person, vehicle, residence or any property under your control" with or without suspicion, CDOC could reasonably conclude that inmates can expect to at least have *met* the person performing the search ahead of time. In a similar vein, CDOC may also have safety concerns in mind. A search without warning is likely to be less provocative if the individual being searched is familiar with the officer conducting the search. All of this could factor into a community inmate's legitimate expectation of privacy.

Examining this totality of the circumstances, Mathews would have a stronger case if the search in question had been a traditional, in-person search. However, Anderson's searches of Mathews took place entirely without Mathews's knowledge. Thus, the presumed policy justifications behind the "your CPO" limitation appear to have little or no applicability or force. Moreover, Anderson accessed Mathews's historical GPS data; he did not track Mathews in realtime. The Court does not hold that any of these factors is the *sine qua non* of a permissible search by a non-assigned parole officer. Under the circumstances, however, the deviation from the expectation of privacy created by "your CPO" was so *de minimis* as to be imperceptible to Mathews. Therefore, "his limited expectation of privacy was outweighed by the State's strong interest in monitoring his behavior and preventing his recidivism." *Mabry*, 728 F.3d at 1169–70.

For these reasons, the Court denies Mathews's GPS Suppression Motion.

### III. GPS *DAUBERT* MOTION (ECF No. 40)

Mathews's GPS *Daubert* Motion nominally objects to the Government's GPS

expert's testimony under Federal Rule of Evidence 702. As will be explained below,

Mathews's objection is actually grounded in the Federal Rule of Criminal Procedure

16(a)(1)(G) obligation to disclose "a written summary of any testimony that the

government intends to use under Rules 702, 703, or 705 of the Federal Rules of

Evidence during its case-in-chief at trial," which summary must "describe the witness's

opinions, the bases and reasons for those opinions, and the witness's qualifications."

## A.    Alleged Discrepancy Between GPS Data and Other Evidence

The Government designated Mr. James Buck as its GPS expert in this case.

(ECF No. 40 ¶ 3.)  Mathews's counsel represents that he

> has been aware since his appointment as defense counsel
> that the Government intended to present expert testimony
> regarding the GPS coordinates for Defendant Mathews
> relating to the two charged armed robberies.  Moreover, the
> undersigned has known the identity of [Mr. Buck] for months
> and has communicated with [him] both by phone and
> through email.  Assistant US Attorney Winstead has been
> totally forthcoming regarding the underlying data that
> [Mr. Buck] would utilize in opining as to the location of
> Defendant Mathews during relevant times in the case.  Mr.
> Winstead and the undersigned have met in person to review
> several points of the data and Mr. Winstead has assisted the
> undersigned in utilizing Google Map[s] to track various
> coordiantes [*sic*] in the discovery.  The undersigned has the
> underlying data and theidentify [*sic*] of [Mr. Buck].  What the
> Defense lacks is the analysis done by [Mr. Buck].

(*Id*. ¶ 2.)

The "analysis" Mathews apparently wishes to receive is something like a map

showing where Mr. Buck has plotted the various GPS coordinates.  In September 2016,

Mathews's counsel e-mailed Mr. Buck directly, copying the Government's attorney,

explaining that his own plot of those GPS coordinates showed Mathews entering one of

the pawnshops during the alleged robbery, then exiting, then entering again.  (*Id*. ¶ 3.)

Mathews's counsel stated to Mr. Buck, "I would appreciate it if you could give me your

analysis of the data and tell me if you agree with the accuracy of the Google search."

(*Id*. (internal quotation marks omitted).)  Although it is not clear whether Mathews's

counsel said so to Mr. Buck, he finds this enter-exit-reenter sequence significant

because it "appear[s] to be in conflict with the various reports and videotape of the

armed robbery that did not show an individual entering, leaving then re-entering during

the crime."  (*Id*. ¶ 4.)  Mr. Buck has not provided any map of his own.  (*Id*. ¶ 5.)

The Government responds that there is no dispute regarding the latitude and

longitude coordinates, nor regarding where those coordinates plot on Google Maps.

(ECF No. 60 at 11.)  Thus, the Government appears to agree that these coordinates

appear to show the enter-exit-reenter sequence described above.  The Government

goes on to state,

> To the extent that the defendant wishes to engage in
> questioning Mr. Buck about the accuracy of the latitude and
> longitude coordinates, or the compatibility of those
> coordinates with other evidence in the case, such
> questioning is appropriate material for cross examination at
> trial, but is not an essential part of the United States' duty to
> disclose Mr. Buck's opinion.  Additionally, any purported
> inconsistencies between the location data and other
> evidence in the case is proper with regard to the weight of
> that evidence or potentially to the appropriate foundation for
> the evidence, but do not create a need for a hearing under
> *Daubert*.

(*Id*. at 11–12.)

As far as the Government's counterargument goes, the Court agrees.

Nonetheless, the Court finds that Mathews is entitled to more detail regarding

Mr. Buck's expected testimony. Specifically, the Court will order the Government to produce Mr. Buck's plot of the GPS data during the time period encompassing the alleged enter-exit-reenter sequence (11:41 a.m. to 12:07 p.m. on March 23, 2016). The Court will further order the Government to provide a substantial summary of: (1) Mr. Buck's explanation of any differences between his plot and Mathews's counsel's plot for the same time period; and (2) Mr. Buck's opinions regarding the accuracy of GPS data from the sort of ankle monitor at issue and the reasons why tracking data obtained through that kind of ankle monitor might not reflect its precise location.

**B.      Challenge to Qualifications**

Mathews argues, "In the event that the Court deems the suppression of Mr. Buck's testimony an inappropriate sanction, the Defense requests a *Daubert* hearing regarding Mr. Buck's credentials to testify as an expert on GPS data." (ECF No. 40 ¶ 6.) Mathews acknowledges, however, that Mr. Buck has previously been admitted as a GPS expert in this District (*id*.), and Mathews offers no reason to doubt Mr. Buck's credentials now. Mathews instead claims,

> The question under *Daubert* is whether Mr. Buck can lay a foundation for the veracity of the GPS data when the Defense believes that an insurmountable conflict may exist between what the GPS data says about Mr. Mathews'[s] movements on March 23, 2016 as compared to the statements of witnesses and the videotape within the pawnshop that was robbed.

(*Id*. ¶ 7.) The Court is unsure what Mathews means by "the veracity of the GPS data." The GPS data is a series of latitude and longitude coordinates and Mathews's counsel states that he has those coordinates in his possession. If Mathews means to challenge

the *accuracy* of the GPS data, the Court does not see that as a matter of Mr. Buck's credentials. It is, rather, a matter for cross-examination. The Court therefore denies Mathews's request to disqualify Mr. Buck based on his credentials.

## IV. UINTA SUPPRESSION MOTION (ECF No. 34)

In April 2016, the Government executed a search warrant on a residence at 1538 Uinta Street, in Denver, and discovered "inculpatory evidence" that is otherwise undescribed. (ECF No. 54 at 3; *see also* ECF No. 54-1.) Apparently this Uinta Street location was not Mathews's address of record. (ECF No. 34 ¶ 7.) Mathews argues that the affidavit of the Government agent who obtained the search warrant failed to demonstrate probable cause because it "did nothing to establish that Mathews had weapons or other evidence [at that residence] associated with the [pawn shop] robberies." (*Id*. ¶ 16.)

The Court need not address probable cause directly. The warrant in question was issued by U.S. Magistrate Judge Michael E. Hegarty. (*See* ECF No. 54-1 at 33.) The Government agents who executed the warrant were entitled to rely on it unless Mathews can show that they lacked objectively reasonable good faith in doing so. *See United States v. Leon*, 468 U.S. 897, 922–25 (1984). Such lack of good faith encompasses at least five potential scenarios:

1.      when the issuing magistrate judge was misled by an affidavit containing false information or information that the affiant would have known was false if not for his reckless disregard of the truth;

2.      when the issuing magistrate judge wholly abandons his or her judicial role;

3.      when the affidavit in support of the warrant is so lacking in indicia of

probable cause as to render official belief in its existence entirely

unreasonable;

4.      when a warrant is so facially deficient that the executing officer could not

reasonably believe it was valid; and

5.      when the warrant's flaw results from recurring or systemic police

negligence.

*United States v. Campbell*, 603 F.3d 1218, 1225–26 (10th Cir. 2010).  Mathews's only

challenge under this standard is the third option, *i.e.*, a warrant affidavit that no official

could reasonably believe to establish probable cause.  The Court disagrees.

The warrant affidavit is fairly detailed, but the major points are as follows:

•      based on the affiant's training and experience, parolees frequently

maintain a second address that is unknown to their parole officer so that

the address will not be subject to a parole search;

•      a parole search of Mathews's address of record yielded nothing in

February 2016;

•      GPS data showed that Mathews visited 1538 Uinta Street soon after the

two pawn shop robberies of which he is suspected;

•      GPS data showed that Mathews visited 1538 Uinta Street at least 44

times between December 21, 2015, and April 3, 2016, including 40 of the

45 days between February 16 and April 3, 2016, often staying for many

hours; and

•      a pole camera captured video of Mathews using a key to enter 1538 Uinta

Street on April 1, 2016, and leaving a black bag full of unknown contents
inside the residence.

(ECF No. 54-1 ¶¶ 22, 23, 24, 29, 30, 38.)

Mathews principally relies on two Tenth Circuit decisions to argue that the
foregoing could never establish probable cause.  (ECF No. 34 ¶¶ 16–18.)  The first
decision is *United States v. Biglow*, 562 F.3d 1272 (10th Cir. 2009), which discusses
the amount of evidence needed to justify a search warrant of a suspect's residence
when the police have never observed the suspect engaging in suspected criminal
activity linked to his or her residence.  The Tenth Circuit affirmed the requirement for "a
nexus . . . between suspected criminal activity and the place to be searched," *id*. at
1278, and enumerated "non-exhaustive factors relevant to [the] nexus analysis,"
namely, "(1) the type of crime at issue, (2) the extent of a suspect's opportunity for
concealment, (3) the nature of the evidence sought, and (4) all reasonable inferences
as to where a criminal would likely keep such evidence," *id*. at 1279.  In *Biglow*, the
Tenth Circuit held that probable cause existed to search the defendant's house, even
though the house had never been so much as surveilled, because (1) police officers
had observed the defendant purchasing drugs in distribution-level quantities, and
(2) the investigating agent affirmed in his warrant affidavit that drug dealers often keep
evidence related to their illegal activities in their homes.  *Id*. at 1282–83.

If probable cause existed in *Biglow*, it is hard to imagine how it did not exist to
search 1538 Uinta Street, for which investigators had much more evidence about the
connection between the suspect and the crime.  Indeed, among other things,
investigators knew that Mathews had visited the address immediately after the two

suspected robberies, and they relied on their own experience that persons in Mathews's situation often keep a second address where they may store possessions free from unannounced parole searches.

This brings us to the second case on which Mathews principally relies, *United States v. Roach*, 582 F.3d 1192 (10th Cir. 2009). *Roach* reaffirms that probable cause to search "cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched." *Id*. at 1201 (internal quotation marks omitted). Under that standard, the Tenth Circuit found probable cause lacking when "the most recent indication of [the criminal activities at issue] was some *five years* before issuance of the warrant." *Id*. (emphasis in original). *Roach* noted the contrast between that amount of time and the amount of time at issue in a prior case, *United States v. Mathis*, 357 F.3d 1200 (10th Cir. 2004). As described by *Roach*, *Mathis* "held that information from four confidential informants indicating that a suspect was dealing drugs, which collectively spanned a period from two years before issuance of the warrant to less than two months before, was not so stale as to obviate probable cause." *Roach*, 582 F.3d at 1201.

In this case, the second pawn shop robbery took place on March 23, 2016, and the search warrant affidavit was submitted on April 5, 2016, only thirteen days later. There is no reason evident in the record (and Mathews points to no such reason) why investigators should have concluded in the intervening thirteen days that 1538 Uinta Street was no longer a likely location to find evidence of Mathews's suspected crime.

Accordingly, assuming *arguendo* that investigators somehow lacked actual

24

probable cause (a dubious assumption), it is beyond doubt that they could rely in good faith on the magistrate judge's issuance of the warrant. Or in other words, the warrant affidavit was *not* "so lacking in indicia of probable cause as to render official belief in [the] existence [of probable cause] entirely unreasonable." *Campbell*, 603 F.3d at 1225–26 (internal quotation marks omitted). Mathews's Uinta Suppression Motion will be denied.

## V. PHOTO LINEUP MOTIONS (ECF Nos. 32 & 33)

Mathews's Photo Lineup Motions (ECF Nos. 32 & 33) seek to suppress identifications of him made by two different confidential informants (designated "CI One" and "CI-11317") from identical photo arrays. (*See* ECF Nos. 32-1 & 33-1.)

### A. Background

While investigating the pawn shop robberies, agents eventually made contact with CI One, who had allegedly pawned some of the items stolen from a pawn shop robbery in October 2015. (*See* ECF No. 54-1 ¶¶ 13–14.) On December 18, 2015, an ATF agent interviewed CI One, who allegedly stated that she met Roger Dean (a longtime acquaintance and her former pimp) in a parking lot along with "'another male' she described as a large unidentified male with 'cornrows' or 'braids.'" (ECF No. 32 ¶¶ 3, 7.) Dean and the unidentified male gave CI One several bags of jewelry to pawn, which CI One believed to have been stolen. (*Id*. ¶¶ 3–5.) During her interview with the ATF agent, CI One was shown six photos of African-American males, and she selected a particular photo as the one depicting Roger Dean's companion. (*Id*. ¶ 7.) That photo turned out to be of Mathews. (*Id*.)

In the following months, investigators identified another person whom they suspected of pawning items for Mathews. (ECF No. 33 ¶ 2.) This person became a confidential informant, CI-11317. She stated to investigators that "Vince and Rodger" gave her items to pawn. (*Id*. ¶ 3.)[8] On March 31, 2016, an ATF agent showed CI-11317 the same series of six photos shown to CI One, and CI-11317 identified the photo of Mathews as a photo of the person she knew as "Vince." (*Id*. ¶ 7.)

## B.    Photo Lineup Standard

An impermissibly suggestive identification procedure, including an impermissibly suggestive photo array, may be a violation of due process. *See Perry v. New Hampshire*, 132 S. Ct. 716, 718 (2012).

> When the constitutionality of a photo array is challenged, the due process clause requires a two-pronged inquiry: first, the court must determine whether the photo array was impermissibly suggestive, and if it is found to be so, then the court must decide whether the identifications were nevertheless reliable in view of the totality of the circumstances.

*United States v. Sanchez*, 24 F.3d 1259, 1261–62 (10th Cir. 1994).

## C.    Whether the Lineup Was Impermissibly Suggestive

To determine "whether the photo array was impermissibly suggestive," "[c]ourts use a number of factors . . . including the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves." *Id*. at 1262. Generally speaking, however, the size of a photo array is not a factor deserving independent consideration, but "merely affects the *weight* given to other alleged

---

[8] On the record presented, it is not clear if this "Rodger" is the aforementioned Roger Dean.

problems or irregularities in an array. The larger the number of pictures used in an array, the less likely it is that a minor difference, such as background color or texture, will have a prejudicial effect on selection." *Id*. (emphasis in original).

The actual photos presented to the two witnesses are the following:



1.  2.  3.

4.  5.  6.

(ECF No. 53-2 at 7.)  It is undisputed that these photos were presented one at a time, not in the 3 x 2 array depicted above.  (*See* ECF No. 63 ¶ 2.)  The second photo, depicting Mathews, is the photo selected by both confidential informants.

Mathews argues that this series of photos is impermissibly suggestive for the following reasons:

- "Mathews was the only one of the six individuals who was almost bald";

- "Mathews'[s] photo . . . would have drawn the attention of anyone viewing the array because Mathews'[s] head filled much more of the area of the photo in comparison to the individuals in positions 1, 3, 4 and 6";

- "Mathews . . . appeared much older than the other individuals depicted in the array and particularly as to subjects 1, 3, 4 and 6"; and

- "Mathews'[s] countenance in his photo was frowning and hostile as compared to the pleasant and engaging expressions of Numbers 1, 3, and 5.  Individuals 4 and 6 had neutral expressions."

(ECF No. 32 ¶¶ 8–9; *see also* ECF No. 33 ¶¶ 8–9.)

The Court must take these distinctions seriously because "six photographs [is] a number sufficiently small to weigh heavily in the balance of factors to be considered." *Sanchez*, 24 F.3d at 1263.  Nonetheless, the Court finds no undue suggestion.  The distinctions Mathews highlights are fairly obvious when viewing all of the photos on a single page, but the Court cannot say that those distinctions would be unduly suggestive when viewing each photo in isolation.

In addition, there is no distinction unique to Mathews.  The face in the fifth photo fills about as much of the frame as Mathews's face does in his photo.  The individual in

28

the fourth photo has an expression similar to Mathews's.  Contrary to counsel's argument, Mathews does not look significantly older than any other individual depicted. Finally, the fifth photo appears to depict a man with roughly the same amount of hair; the difference is that Mathews, for his photo, raised his chin and therefore did not face the camera as directly as the individual in the fifth photo.  Moreover, nothing in the record suggests that the police knew enough of Mathews's description to attempt to highlight his hairline by contrasting it with those of the other individuals whose photos were selected for the lineup.

Given the lack of undue suggestion, the Court need not reach whether the photo identifications were reliable under the totality of the circumstances.  Mathews's Photo Lineup Suppression Motions will be denied.

## VI.  INTERROGATION SUPPRESSION MOTION (ECF No. 38)

On the date of his arrest, Mathews was interrogated at the Aurora Police Department.  (ECF No. 38 ¶ 1.)  Mathews signed a *Miranda* waiver form, made a statement that he "sometimes" uses firearms, and then informed the interrogating agents that he did not wish to continue answering their questions.  (*Id*.)  Seven minutes later, however, certain agents entered the room and continued questioning Mathews. (*Id*. ¶ 2.)  Mathews again made potentially incriminating statements about firearms, and then again stated that he did not want to answer any more questions.  (*Id*.)  Mathews argues that the second interrogation violated his *Miranda* rights.  (*Id*. ¶¶ 3–5.)

The Government responds that it does not intend to introduce any statement Mathews made after the first time he announced that he did not want to answer any

more questions.  (ECF No. 58 at 1–2.)  Mathews's Interrogation Suppression Motion will therefore be denied as moot.

## VII.  404(b) MOTION (ECF No. 35)

The Government has expressed to Mathews an intent to seek to introduce a prior conviction (receiving stolen property) against Mathews at trial, invoking Federal Rule of Evidence 404(b).  (ECF No. 35 ¶ 2.)  Mathews therefore "seeks an order from the Court requiring the Government to designate the 404(b) evidence . . . sufficiently in advance of the trial so that the Defense can litigate the admissibility of that evidence." (*Id*. ¶ 3.)

Plainly Mathews already has notice of the Government's intent regarding his prior conviction.  As for any other potential Rule 404(b) evidence, the Court has already established a 21-days-before-trial deadline.  (ECF No. 20 at 4.)  This timetable normally provides enough time to litigate the admissibility of Rule 404(b) evidence because motions *in limine* will be due seven days before the Final Trial Preparation Conference, *see* WJM Revised Practice Standard III.F.3, and the undersigned normally sets the Final Trial Preparation Conference approximately one week before trial, *see id*. IV.B.1. Thus, defendants usually have about one week to prepare any motion *in limine* they may wish to file based on the Government's Rule 404(b) disclosure.

In this case, however, only eighteen days remain on the Speedy Trial clock. Thus, as of the date of entry of this order and a contemporaneous order setting the trial for 18 days from today, that 21-day deadline will have already passed.  The Court will therefore order the Government to make its Rule 404(b) disclosure no later than April

25, 2017, thus permitting Mathews a short but sufficient amount of time in which to prepare and timely file a motion *in limine*, if he so desires. Mathews's Rule 404(b) Motion will therefore be granted in part to this extent.

## VIII. MOTION FOR BILL OF PARTICULARS (ECF No. 36)

Mathews requests that the Government be required to file a bill of particulars

> as to what theory the Government will pursue at trial.
> Specifically was Mathews one of the robbers who
> brandished weapons and forced the employees to turn over
> guns, jewelry and money?  On the other hand, was Mathews
> an aider and abettor, and if so, what acts did he commit in
> aiding and abetting the armed robbers?

(ECF No. 56 ¶ 4.)  The Government responds that it "intends to pursue both theories, in the alternative."  (ECF No. 56 1–2.)

The Court finds the Government's response sufficient to moot Mathews' request for a bill of particulars.  Without ruling that Mathews is entitled to a bill of particulars, the Court notes that "the defendant is not entitled to notice of all of the *evidence* the government intends to produce, but only the *theory* of the government's case."  *United States v. Ivy*, 83 F.3d 1266, 1281 (10th Cir. 1996) (emphasis in original; alterations removed; internal quotation marks omitted).  The Government has sufficiently disclosed its theory.  Mathews's Motion for Bill of Particulars will therefore be denied as moot.

## IX. CONCLUSION

For the reasons set forth above the Court ORDERS as follows:

1. Mathews's Motion to Suppress In-Court and Out-of-Court Identification Regarding Confidential Informant Number One (ECF No. 32) is DENIED;

2. Mathews's Motion to Suppress In-Court and Out-of-Court Identification

Regarding CI-11317 (ECF No. 33) is DENIED;

3.      Mathews's Motion to Suppress Evidence Obtained Through Search Warrant of
        1538 Uinta Street, Denver, Colorado (ECF No. 34) is DENIED;

4.      Mathews's Motion Seeking Disclosure of Other Crimes, Wrongs, or Acts
        Pursuant to Rule 404(b) (ECF No. 35) is DENIED AS MOOT, but the
        Government shall nonetheless make its Rule 404(b) disclosure no later than
        **April 25, 2017**;

5.      Mathews's Motion for Bill of Particulars (ECF No. 36) is DENIED AS MOOT;

6.      Mathews's Motion to Suppress Warrantless Seizure of GPS Tracker Evidence
        (ECF No. 37) is DENIED;

7.      Mathews's Motion to Suppress Statements Made During Custodial Interrogation
        (ECF No. 38) is DENIED AS MOOT;

8.      Mathews's Motion to Exclude Expert Testimony Regarding GPS Coordinates or
        in the Alternative for a *Daubert* Hearing (ECF No. 40) is GRANTED IN PART and
        DENIED IN PART as follows:

        a.      On or before **April 27, 2017**, the Government must produce to Mathews's
                counsel:

                i.      Mr. Buck's plot of the GPS data during the time period
                        encompassing the alleged enter-exit-reenter sequence (11:41 a.m.
                        to 12:07 p.m. on March 23, 2016);

                ii.     Mr. Buck's explanation of any differences between his plot and
                        Mathews's counsel's plot for the same time period; and

      iii.    Mr. Buck's opinions regarding the accuracy of GPS data from the sort of ankle monitor at issue and the reasons why tracking data obtained through that kind of ankle monitor might not reflect the its precise location;

   b.    This Motion is otherwise denied;

9.    Mathews's Motion for Hearing (ECF No. 42) is DENIED;

10.   Given the proximity to trial and the Court's need to plan accordingly, any motion for an ends-of-justice continuance of the Speedy Trial clock **must be filed no later than April 26, 2017**.  In the event the Court grants a continuance of the trial, the deadline by which the Government must produce to Defendant the information described in Paragraph 8 above shall be extended to **May 15, 2017**, and the Government's Rule 404(b) obligation established in Paragraph 4 above shall revert to the 21-days-before-trial deadline previously ordered.

Dated this 20th day of April, 2017.

BY THE COURT:

_____

William J. Martinez
United States District Judge

33