IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Criminal Case No. 16-cr-129-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    VINCENT SCOTT MATHEWS,

    Defendant.

---

**ORDER SUSTAINING IN PART AND OVERRULING IN PART
DEFENDANT'S RULE 404(b) OBJECTIONS**

---

On April 25, 2017, the Government filed its notice of the potential Rule 404(b) evidence it plans to use against Defendant Vincent Scott Mathews ("Mathews"). (ECF No. 83.) Currently before the Court is Mathews's Objection to Admission of the Government's Proffered Rule 404(b) Evidence. (ECF No. 94.) For the reasons explained below, Mathews's objections are sustained in part and overruled in part.

### I. LEGAL STANDARD

Pursuant to Federal Rule of Evidence 404(b)(1), the admission of evidence of a crime or "bad act" to prove a person's character "in order to show that on a particular occasion the person acted in accordance with the character" is precluded from the jury's purview. Such evidence may be admissible for other purposes, however, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Even so, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger

of . . . unfair prejudice." Fed. R. Evid. 403.

Given all of this, the Tenth Circuit has stated the Rule 404(b) analysis in terms of a four-part inquiry:

> Four general requirements emanating from Rule 404(b) and other relevancy rules must be met before evidence of prior acts will be admissible: (1) the evidence must be offered for a proper purpose under Rule 404(b); (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination that the probative value of the similar acts evidence is not substantially outweighed by its potential for unfair prejudice; and (4) under Rule 105, the trial court must, upon request, instruct the jury that the evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

*United States v. Joe*, 8 F.3d 1488, 1495 (10th Cir. 1993).

## II. BACKGROUND

On August 24, 2011, two African-American males disguised with face paint robbed a Denver jewelry store at gunpoint. (ECF No. 83 at 4; *see also* ECF No. 94 ¶ 1.) Eight days later, Mathews and his wife were stopped for speeding in Utah, and the police discovered a stolen pistol in the car along with jewelry traced to the August 24 robbery. (ECF No. 83 at 4.) The following year, Mathews was convicted in Colorado state court of possessing stolen property worth more than $20,000. (*Id.* at 3–4.) He was released to a halfway house "in early 2015." (*Id.* at 4.)

On July 13, 2015, two African-American males with bandannas covering their faces robbed a Denver pawn shop at gunpoint. (*Id.* at 2.) Federal agents began investigating this robbery, which they considered related to allegedly similar robberies committed in 2012, 2013, 2014, and earlier in 2015. (*Id.*)

Mathews progressed from the halfway house to home detention in September 2015. (*Id.* at 4.) At that time, Mathews was not required to wear a GPS ankle monitor.

2

On October 4, 2015, two African-American males and one African-American female wearing ski masks robbed an Edgewater, Colorado, pawnshop at gunpoint. Two days later, Mathews received a GPS ankle monitor—but not because he had become a suspect in the pawn shop robberies. Rather, he had become a suspect in a May 2015 drive-by shooting, thus prompting his parole officer to impose a GPS condition. (*Id.* at 4.) No charges have ever been filed against Mathews regarding that drive-by shooting. (*Id.*)

Nonetheless, Mathews did become a suspect in the pawn shop robberies not long after, apparently some time between October and December 2015. (*See id.* at 2–3.) Federal agents had identified pieces of jewelry at other pawnshops confirmed to have been stolen in the July and October 2015 robberies, located the individuals who re-pawned those items, and learned from them that "[Mathews], along with others, had provided the jewelry to these individuals so that it could be pawned on his behalf." (*Id.* at 3.)

On December 1, 2015, two African-American males wearing masks and hats robbed a Denver pawnshop at gunpoint. (*Id.*) On March 23, 2016, three African-American males wearing masks and hooded sweatshirts robbed an Aurora, Colorado, pawnshop at gunpoint. (*Id.*)

Around this time, the investigating agents learned that Mathews had been on GPS monitoring since the previous October. They checked his historical GPS data and discovered that Mathews "arrived and left the scene of the December [2015] and March [2016] robberies at the same time as the robbers were seen to arrive and depart on the security cameras." (*Id.* at 4.) "They also found that [Mathews] was in the location of

3

various pawn shops where stolen jewelry from the July and October robberies had been pawned." (*Id.*)

On April 6, 2016, law enforcement officers executed a search warrant at a Denver address that Mathews had frequently visited. The search warrant found "documents associated with [Mathews] and his wife, and also a pistol which had been stolen in the December 2015 robbery." (*Id.* at 4–5.)

### III.  ANALYSIS

**A.  Mathews's Prior Conviction**

The Government intends to introduce "the facts underlying [Mathews's] previous felony conviction in 2012 for theft by receiving, more than $20,000." (ECF No. 83 at 7.) Specifically, the Government wants to introduce evidence of the conviction, as well as of the circumstances of that robbery: "two African-American males with disguised faces armed with pistols took a large amount of jewelry from the store." (*Id.* at 8.) The Government argues that "the evidence is relevant to show that [Mathews] was not simply in the wrong place at the wrong time." (ECF No. 83 at 8.) The Government invokes the "doctrine of chances," meaning the inference a jury may draw when unlikely events happen more than once to the same person: "with extremely rare events, once is an accident, but twice or three times is a pattern." (*Id.* at 9.) As applied to this case, the Government argues that Mathews

> was found in possession of jewelry stolen in an armed robbery [in 2011]. That evidence is relevant to show the objective improbability that after finding himself associated with an armed robbery in the past, the defendant would innocently be present on December 2015 and March 2016 precisely at the times those stores were being robbed at gunpoint. Armed robberies are not so common that the defendant could be so frequently associated with them merely by the probability of events.

4

(*Id.*)  The Government also claims that this tends to show "knowledge, intent, motive, absence of mistake, and lack of accident," because "[a] person with that experience, who was in fact still serving that sentence, would have ample reason not to associate himself with further armed robberies without taking some role in them and expecting some benefit from them."  (*Id.* at 9–10.)

Although highly dubious, the Court will assume for argument's sake that the circumstances of the 2011 armed robbery and Mathews' subsequent conviction for possessing stolen property are offered for a proper Rule 404(b) purpose and have some "tendency to make a fact [of consequence] more or less probable than it would be without the evidence."  Fed. R. Evid. 401(a)–(b).  Even under that assumption, the Court must still determine under Rule 403 whether the probative value of the various details the Government wishes to introduce would be outweighed by unfair prejudice.[1]

The Government essentially wants to argue to the jury, "What are the chances that someone suspiciously associated with an armed robbery in 2011 would just happen to arrive and depart at the same time as armed robbers who robbed a pawnshop in 2015, and again in 2016?"  Even if this could be an objective inquiry divorced from the propensities of any specific defendant, the Court does not believe a jury could actually maintain such a distinction in their own minds, no matter how well instructed.  Objective likelihoods of certain behavior are often inseparable from a judgment regarding an individual's criminal character.

---

[1] The Government claims that Mathews has not brought a Rule 403 challenge to this evidence.  (ECF No. 96 at 5.)  Mathews argues, however, that "all of the Rule 404(b) proffer by the Government is inadmissible for one fundamental reason: none of the evidence gives a context to a fact showing that Mr. Mathews participated in or committed any act to aid and abet the charged robberies."  (ECF No. 94 ¶ 23.)

Moreover, Mathews points out that the Government's logic relies on an expectation "that Mr. Mathews will argue that he was accidentally at the scene of the two robberies. The Defense has no intention of pursuing that theory." (ECF No. 94 ¶ 5.) The Government responds that it "must prove the elements of the crime, including a lack of mistake or accident. Absent some sort of affirmative stipulation by the defense, such proof is always at play, whether the defendant chooses to argue it or not." (ECF No. 96 at 5–6.)

The Government is technically correct, but the chances of a jury inferring mistake on their own are so low in this case—the GPS data shows that, on two occasions within a few months of each other, Mathews arrived at a pawnshop just as armed robbers arrived, and he departed just as armed robbers departed—that the probative value is heavily overborne by the likelihood that the jury will simply see the evidence surrounding the 2011 armed robbery as evidence that Mathews is the sort of person who gets involved in armed robberies. Indeed, the Government explicitly argues for that inference when it says that this evidence will show that "[a] person with [Mathews's] experience, who was in fact still serving that sentence, would have ample reason not to associate himself with further armed robberies without taking some role in them and expecting some benefit from them." (ECF No. 83 at 9–10.) Although the Government attempts to couch this in objective language, it is ultimately an invitation for the jury to infer Mathews's criminal character.

Given all this, Mathews's objection to the Government introducing evidence of the circumstances of the August 2011 armed robbery and Mathews's subsequent apprehension and conviction is SUSTAINED.

**B.    Mathews's Prison Time, Release to a Halfway House, and Progression to Home Detention**

The Government describes its next batch of potential Rule 404(b) evidence as follows:

> The United States intends to introduce evidence that the defendant was incarcerated from 2012 through early 2015. That fact first relieves the defendant from any unfair implication that he may have been involved in the robberies investigated in 2012-2014. It also provides background to his housing circumstances in 2015. The United States intends to introduce evidence that the defendant moved to a halfway house in early 2015, and then to home detention in September of that year; that originally he was placed on simple curfew monitoring, but upon suspicion of unrelated criminal activity he was placed on full GPS location monitoring on October 6, 2015. The particular facts that he was first a resident at a halfway house and then on home detention during 2015, with the concomitant increased freedom over his previous incarceration is relevant to his association with robberies in July and October of 2015. Additionally, the context of his placement on GPS monitoring, and the reasons for the use of GPS monitoring by the probation department are relevant both to giving a complete picture of the circumstances and investigation, and to the weight given to the GPS location data. Without those facts, in addition to the confusing gaps that would appear in the circumstances of the case, the jury might unfairly assume that his placement on GPS immediately after the October 4th armed robbery was done as a result of the investigation into the armed robberies.

(ECF No. 83 at 11.) The Court will analyze all of this by breaking it down into its various parts.

    1.    <u>The 2012–14 Armed Robberies</u>

The first question is whether the Government needs to say anything about armed robberies in 2012–14, which Mathews could not have committed given his incarceration. The Government argues that this evidence "is relevant to the background of the investigation." (ECF No. 96 at 9.) The Court understands the need to tell a coherent

7

story, but the probative value of the pre-2015 robberies is substantially outweighed by the risk at least of "wasting time." Fed. R. Evid. 403. The Government has simply offered nothing to show how the jury will be in any better position to decide this case if informed of the pre-2015 robberies, as opposed to a jury that learns of the investigation beginning with the July 2015 robbery.

Moreover, to the extent the Government believes that the 2012–14 armed robberies had a similar *modus operandi*, the Court notes, again, that Mathews could not have been present; and also that masked men robbing a pawnshop at gunpoint and carrying away jewels, guns, and cash is about as generic a *modus operandi* as one could describe with respect to pawnshop robberies.

Mathews's objection to testimony regarding the 2012–14 robberies is SUSTAINED. This ruling obviates the need to inform the jury that Mathews was in prison from 2012–14.

2. <u>Release from Prison to a Halfway House and Then Home Detention</u>

As to the fact that Mathews was released to a halfway house in early 2015, and then progressed to home detention in September 2015, the Court agrees with the Government that such evidence is admissible. The jury will certainly learn that Mathews was wearing a GPS ankle monitor, and any minimally well-informed juror will know that the only persons who wear GPS ankle monitors are those on some sort of probation, parole, or pretrial monitoring. Thus, the inference of association with actual or suspected criminal activity is inevitable. Moreover, the Court expects that the Government will call as a witness Mr. Aaron Anderson, the parole officer who accessed Mathews's GPS data. Mr. Anderson's testimony would be partly incoherent if he was required to avoid explaining that he had access to Mathews's GPS coordinates because

8

he was a parole officer and Mathews is on parole. The jury will therefore necessarily come to understand that Mathews had been on parole, meaning he had been convicted of some sort of criminal activity.

In addition, the Court can see nothing prejudicial about explaining Mathews's precise living circumstances, *i.e.*, a halfway house and then home detention. If anything, this suggests good behavior.

Nonetheless, consistent with the Court's rulings above, the Government's witnesses may not testify regarding (nor may the Government's counsel reveal through questioning or argument) the conviction that sent Mathews to prison or the length of time he spent there before entering the halfway house in early 2015. The Government's witnesses and attorneys may say no more than that Mathews had been imprisoned previously on a prior offense that is not at issue here, or words substantially to that same effect. To that extent, Mathews's objection is SUSTAINED, but it is otherwise OVERRULED.

      3. <u>Investigation of the July and October 2015 Robberies</u>

The Court agrees with the Government that it may discuss its investigation of the July and October 2015 robberies. If the case were otherwise, Government witnesses would not be able to coherently explain why they adopted the investigative strategy they did (*i.e.*, tracing stolen items found in pawnshops to the persons who pawned them and asking those persons how they obtained those items).

Mathews argues that the Government should at least not be permitted to introduce evidence connecting Mathews to those robberies (*e.g.*, that informants told the investigators that Mathews had given them the jewelry to pawn, that Mathews's GPS data put him in the vicinity of pawnshops where the stolen items were re-pawned).

(ECF No. 94 ¶¶ 10–12.)  Again, however, the Court finds that such evidence is necessary to present a coherent story to the jury.  Otherwise the jury would be left confused, having no idea how investigators came to suspect Mathews and why they chose to examine his GPS data.

That said, the Court finds that the probative value of the description of the robbers during the July and October 2015 robberies is substantially outweighed by the likelihood of unfair prejudice under these circumstances.  Again, the general *modus operandi* is far from unique, and beyond that, the only detail the Government might offer is that the robbers were African-American.  If the indictment actually encompassed the July and October 2015 robberies, perhaps this could be relevant, but in these circumstances the Court sees no probative value that outweighs an unfortunately more likely inference that African-Americans commit these sorts of crimes and so an African-American like Mathews is more likely to be guilty.  To that extent, Mathews's objection is SUSTAINED, but it is otherwise OVERRULED.

## C.    The Drive-By Shooting

Finally, the Government wishes to introduce evidence of Mathews becoming a suspect in a drive-by shooting, to explain why Mathews was placed on a GPS ankle monitor on October 6, 2015, as opposed to some other date.

The Court agrees that the specific date on which Mathews received his GPS ankle monitor is important.  If the jury was left to presume, for example, that Mathews had his ankle monitor from the time he entered the halfway house or home detention, the jury would naturally speculate why the Government does not introduce GPS data regarding Mathews's whereabouts during the July and/or October 2015 robberies.  The Government is accordingly entitled to explain that Mathews did not receive his GPS

ankle monitor until after the October 2015 robbery.

Even so, testimony specifically that Mathews was suspected in a drive-by shooting would be highly prejudicial and unnecessary. Even more-generic testimony that he was suspected in other, unrelated criminal activity would still be substantially more prejudicial than probative. The Court finds that the Government's witnesses and attorneys need say no more than something substantially to the effect of, "As part of his home detention, Mathews was eventually required to wear a GPS ankle monitor, which he received on October 6, 2015." Such testimony obscures the fact that GPS monitoring was not an original condition of his home detention, but this detail is irrelevant to the jury's consideration, and greater accuracy would only serve to unfairly prejudice Mathews. To that extent, Mathews's objection is also SUSTAINED, but it is otherwise OVERRULED.

## IV. CONCLUSION

Mathews's Objection to Admission of the Government's Proffered Rule 404(b) Evidence (ECF No. 94) is SUSTAINED IN PART and OVERRULED IN PART as stated above.

Dated this 24th day of October, 2017.

BY THE COURT:

William J. Martinez
United States District Judge